UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| CHERYL J. STOKES,<br>    *Plaintiff*, | )<br>)<br>) | |
| *vs*. | ) | 1:09-cv-00972-JMS-TAB |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of the<br>Social Security Administration,<br>    *Defendant*. | )<br>)<br>) | |

### ENTRY REVIEWING THE COMMISSIONER'S DECISION

Plaintiff Cheryl J. Stokes filed an application for Supplemental Social Security Income benefits on January 28, 2004, alleging disability since April 24, 2000.[1] [R. 87.] Defendant Michael J. Astrue, the Commissioner of the Social Security Administration (the "Commissioner"), denied her application both initially and after reconsideration. [R. 62-66, 57-59.] After going through an extensive appeals process and exhausting the available administrative remedies, Ms. Stokes ultimately filed this action under 42 U.S.C. § 405(g), requesting a review of the Agency's denial decision. [Dkt. 1.]

### BACKGROUND

**I.   Early Treatment History (1998-2000)**

In 1998, Ms. Stokes was working as a toy assembler at Flambeau Products. [R. 539.] Sometime in August of that year, she injured her back while lifting heavy boxes on the job. [R. 331.] On August 18, she went to Dr. Jerome Herrberg seeking treatment for pain in her lower back that radiated down her left leg. [*Id.*] On August 21, she had an x-ray of her spine which showed that her "fifth lumbar segment is bilaterally transitional (sacralized)." [R. 212.] Dr.

---

[1] In April of 2000, Ms. Stokes filed an application for benefits which was denied after reconsideration on December 12, 2000. [R. 3, 129.] Neither that application nor its denial is at issue here.

Herrberg recommended that Ms. Stokes stay home from work for two weeks, and at her follow-up appointment on August 24, he prescribed medication and stretching exercises. [R. 331.]

On October 26, 1998, Ms. Stokes injured her back again, this time while lifting a roll of plastic onto a machine. [R. 335.] On December 3, she had an MRI, which showed a "diffuse mild disc bulge at L5-S1." [R. 284.] On December 19, she saw a neurosurgeon, Dr. Daria Schooler, who diagnosed her with "lumbar strain and right sciatica with an L4-transitional L5 disk bulge with sacralized L5 bilaterally." [R. 335.] Dr. Schooler recommended some temporary work restrictions for Ms. Stokes: no lifting over fifteen pounds and no bending or twisting. [R. 362.] She also prescribed some pain medication and recommended physical therapy. [*Id.*]

Ms. Stokes initially responded well to the physical therapy, but experienced an increase in symptoms near the end of her treatment. [R. 359.] On March 10-11, 1999, she underwent a Functional Capacity Evaluation, which was administered by her physical therapist, Laura Brown. According to Ms. Brown's report, Ms. Stokes "was willing to work to her maximum ability" during the evaluation, but she had "significant deficits" in forward bending, repetitive squatting, standing tolerance, and trunk rotation. [R. 305.] On May 24, based on that report, Dr. Schooler assigned Ms. Stokes the following permanent work restrictions: only frequent sitting, bending, and twisting; occasional squatting, lifting ten pounds from floor or overhead, and lifting thirty pounds at waist height; no frequent lifting over five pounds from any height. [R. 332.] Dr. Schooler estimated that Ms. Stokes had a permanent partial impairment of 4% and advised her to continue her back exercises "indefinitely." [R. 341.]

On April 24, 2000, Ms. Stokes stopped working, allegedly because of her pain. [R. 26, 274.] In June 2000, Ms. Stokes talked to an Agency employee on the telephone and said that she

hadn't "been to any doctor in a while because there isn't anything they can do. They just tell her to take Ibuprofin [sic] and Tylenol and do her exercises so that's what she does." [R. 267.]

On July 1, Ms. Stokes received a consultative examination from Dr. Jason Mara. [R. 319.] Ms. Stokes told Dr. Mara that her lower back pain was "dull and burning" and radiated to her right hip and down her right leg. [*Id.*] She also complained of occasional "pain, numbness, paresthesias and weakness in her right leg." [*Id.*] She reported taking Flexeril and over-the-counter pain medication, and said those drugs were somewhat effective. [*Id.*] Ms. Stokes' lower back movement was limited, but her range of motion was otherwise normal. [R. 321.]

On August 1, Ms. Stokes saw Dr. Herrberg for severe lower back pain. [R. 303.] He noted that he did not want to do tests because she did not have insurance, but he did prescribe rest and pain medication. [*Id.*] At her August 11 follow-up appointment, Ms. Stokes was much improved, with only minimal pain. [*Id.*]

**II. Consultative and Reviewing Physician Opinions (2004)**

On February 21, 2004, Ms. Stokes received a consultative examination from Dr. Alejandro Arizmendi. [R. 171.] Ms. Stokes told him that her lower back pain had "gradually worsened over the past year and…become more tender." [*Id.*] She described the pain as "sharp and radiating" and complained further of "shooting pains and tingling to the lower extremities…more on the right than the left." [*Id.*] She admitted that she had not seen her primary care physician for a few years. [*Id.*] Dr. Arizmendi found that Ms. Stokes was able to walk normally but could not squat and had a decreased range of motion in her shoulders and hips. [R. 172-73.] He opined that her ability to stand and walk would be limited to one hour out of an eight-hour work day, based on muscle weakness in her right leg, and that she would be able to lift and carry ten

pounds or less for short periods of time. [R. 172.] He further opined that her back pain was affecting her daily activities. [*Id.*]

On March 16, Dr. F. Lavallo, a state reviewing physician, opined that Dr. Arizmendi's restrictions were too severe. [R. 167.] Dr. Lavallo instead opined that Ms. Stokes could occasionally lift and carry fifty pounds, frequently lift and carry twenty-five pounds, and stand, walk, or sit for about six hours in an eight-hour work day. [R. 162.]

On April 2, Dr. Thomas Colmey, a state medical consultant, reviewed Dr. Lavallo's opinion. [R. 157-59.] Dr. Colmey revised Ms. Stokes's lifting and carrying restriction to twenty pounds occasionally and ten pounds frequently, but otherwise concurred with Dr. Lavallo's opinion. [R. 158.]

On August 21, Ms. Stokes received a consultative examination from Dr. Joshua Bradley. [R. 153.] Ms. Stokes told him that she had shooting pain from her lower back down into her legs, with more pain in her right leg than her left. [*Id.*] She also complained of numbness and tingling in both legs and feet. [*Id.*] She reported that she could walk about half a mile, sit for about thirty minutes, or stand for fifteen to thirty minutes before her back would begin to hurt, and noted that lying down improved her pain. [*Id.*] Ms. Stokes also complained that her lower back pain radiated into her right shoulder and arm, causing a "burning sensation." [*Id.*] Dr. Bradley noted that her "thoracic spine, lumbar spine, and peri spinal muscles and her right hip are tender to palpation" and opined that she would have trouble standing or walking for two hours out of an eight-hour work day. [R. 154.] He found that her range of motion was restricted in her back, knees, and hips. [R. 155.]

In September 2004, Dr. J. Sands, a state reviewing physician, essentially confirmed Dr. Colmey's assessment.[2]  [R. 143-150.]

### III.  Recent Treatment History (2004-2008)

On October 29, 2004, Ms. Stokes sought treatment at a free health clinic for low-income patients.  [R. 386.]  She complained of pain in the cervical, thoracic, and lumbar areas of her spine at that time and again at her follow-up appointment on November 19.  [*Id.*]  She visited the clinic again on December 7, when she complained that her back pain was making it hard for her stand up.  [R. 384.]  At that time, she was diagnosed with degenerative joint disease.  [*Id.*]  She returned on January 12, 2005, this time complaining of pain in her right shoulder.  [*Id.*]  The provider noted that Ms. Stokes experienced some relief from her medications.  [*Id.*]

On March 16, 2005, Ms. Stokes went back to the free clinic complaining of back pain and severe pain in her right shoulder through her entire range of motion.  [R. 383.]  Her provider referred her for another MRI of her spine and an x-ray of her right shoulder.  [R. 375-76.]  The MRI confirmed her diagnosis of degenerative disc disease and showed only minimal changes since her last MRI in 1998.  [R. 375.]  The shoulder x-ray was normal.  [R. 376.]

On April 19, Ms. Stokes visited the clinic again complaining of pain all over her entire body.  [R. 383.]  She stated that the Flexeril was no longer working to relieve her pain.  [*Id.*]  Dr. Charles Rau, her treating physician, diagnosed her with "classic fibromyalgia," noting that she had "more than 18 trigger points."  [*Id.*]  At a follow-up appointment on May 17, Ms. Stokes reported improvement in her pain, but Dr. Rau noted that her trigger points were "still tender."  [R.

---

[2] The Court's understanding of Dr. Sands' opinion is gathered solely from the boxes he checked on the Physical Residual Functional Capacity Assessment form [R. 144].  His handwritten comments are illegible.  [R. 149.]

5

382.] She continued to visit the clinic on a monthly basis, and on September 22, Dr. Rau referred her for physical therapy. [R. 381.]

When Ms. Stokes went in for her physical therapy initial evaluation on September 12, she complained of chronic pain in multiple areas of her body, and reported that her pain and fatigue rendered her "unable to perform household duties." [R. 377.] She was prescribed a six-week course of therapy with biweekly office visits, and her long-term goals included sleeping four or five hours every night and "being able to wash an entire set of dishes prior to a rest break." [R. 377-78.] Ms. Stokes' therapist noted that she walked with an "antalgic gait" and continually shifted her weight. [R. 379-380.] On November 12, she was discharged from therapy because her progress had "plateaued." [R. 390.] Her therapist noted that she had not met her goals of uninterrupted sleep or dishwashing, and that her pain persisted with varying intensity. [*Id.*]

On November 21, Ms. Stokes saw Dr. Rau again, and he upgraded her diagnosis of fibromyalgia to "severe," noting that "all trigger points are tender." [R. 398.] Ms. Stokes continued to see Dr. Rau through November 2008 with one brief period of improvement in January 2006. [R. 398, 397, 432, 431, 460-61, 456-60.]

### IV. Administrative History

After the Agency rendered the initial denial decision and the denial upon reconsideration, Ms. Stokes requested a hearing, which was held before Administrative Law Judge ("ALJ") Ann Rybolt on April 7, 2006 and resulted in another denial on November 21, 2006. [R. 470-532, 218-22.] On April 2, 2007, Ms. Stokes requested that the Appeals Council review the ALJ's decision. [R. 237-240.]

Her request for review was granted, and on May 22, 2007, the Appeals Council remanded her case back to the ALJ. [R. 242-244.] In its remand order, the Appeals Council specifically

instructed the ALJ to, among other things, further evaluate Ms. Stokes' fibromyalgia and subjective complaints of pain, consider the opinions of the consultative examiners, and "if necessary" obtain additional medical expert evidence as to the "nature and severity" of her impairments. [R. 243.]

On December 15, 2008, the ALJ held a supplemental hearing on Ms. Stokes' application. [R. 533-595.] At that hearing, Ms. Stokes testified that in April of 2000, she was feeling exhaustion and pain over her entire body. [R. 552.] She described her pain as "a constant ache," "burning," and "shooting." [R. 554-55.] Ms. Stokes further testified that all of her muscles were "tender" and that her right hip pain was worse than her left hip. [R. 557.] She said that her pain was constant and that walking caused "a sharp, sharp pain" with each step. [R. 558.] She mentioned that when she was still working at the Flambeau factory, she often volunteered to go home early because of her pain. [R. 554.] She took the maximum daily dose of extra-strength Tylenol and experienced some relief. [R. 566.] As to her daily activities in 2000, Ms. Stokes testified that she avoided driving because of her fatigue and often had to lie down for four or five hours during a normal day. [R. 564.]

Regarding her daily activities in 2004, Ms. Stokes testified that she cooked simple meals in the microwave and went grocery shopping with her husband, although she sometimes had to rest while shopping. [R. 561, 565.] She did some sweeping and laundry, but she mentioned that these tasks took longer to do, and she was unable to do any dusting because the motion caused pain in her arm. [R. 561.] She stated that she believes she had fibromyalgia in 2004, even though she wasn't diagnosed with it until 2005, because she feels the same symptoms now that she did then. [R. 565.] As for her medical treatment history, Ms. Stokes testified that she was

not on Medicaid or any kind of health insurance until about six weeks before the hearing date, when she was accepted into a state health insurance program. [R. 559.]

Dr. Richard Hutson, an orthopedic surgeon, also testified at the second hearing. [R. 566-87.] He stated that he didn't see any joint problems in Dr. Mara's 2000 examination of Ms. Stokes, and he believed her MRI results were not unusual for her age. [R. 571.] Dr. Hutson further testified that he disagreed with Dr. Arizmendi's finding that Ms. Stokes could only stand and walk for one hour. [R. 573-74.] Dr. Hutson also disagreed with Dr. Bradley's finding that Ms. Stokes would have trouble standing or walking for two hours, and noted that Dr. Bradley's findings did not correspond to the diagnostic criteria for fibromyalgia as promulgated by the American College of Rheumatology.[3] [R. 575-76.] Dr. Hutson dismissed Dr. Rau's diagnosis because Dr. Rau found that Ms. Stokes was tender in eighteen out of twenty-eight trigger points, and according to the diagnostic criteria for fibromyalgia, there are only eighteen total trigger points. [R. 576.] Dr. Hutson opined that Ms. Stokes would be able to do light work, but that this opinion did not include any limitation for Ms. Stokes's fibromyalgia; it was based solely on her degenerative disc disease. [R. 581-83.] In Dr. Hutson's opinion, Ms. Stokes had never been properly diagnosed with fibromyalgia at all. [R. 583.] Dr. Hutson also testified that, based on Dr. Bradley's findings of decreased range of motion, Ms. Stokes would likely have trouble sitting. [R. 584-85.]

Mr. Michael Blankenship, a vocational expert, also testified at Ms. Stokes's second hearing. [R. 587-594.] He testified that, based on Dr. Hutson's opinion that Ms. Stokes could do light work, she could perform all of her past relevant work. [R. 593.] However, Mr. Blankenship also testified that if Ms. Stokes' testimony about her pain was credible, there would be no

---

[3] As the ALJ noted at the time of the hearing, these diagnostic criteria are not in the record. [R. 572.]

8

jobs she could perform, primarily because no employer would accommodate her need to lie down for four to five hours each day. [R. 594.]

The ALJ rendered a second denial decision on January 22, 2009. [R. 24-34.] In that decision, the ALJ found that Ms. Stokes' last insured date was December 31, 2004, and that she did not engage in substantial gainful activity between that date and her alleged onset date of April 24, 2000. [R. 26.] The ALJ also found that Ms. Stokes had one severe impairment: degenerative disc disease of the lumbar spine. [R. 27-28.] At Step Three, the ALJ found that Ms. Stokes' impairments, separately and in combination, did not meet or equal any Listed Impairment through December 31, 2004. [R. 28.] The ALJ assigned Ms. Stokes an RFC of light work with some restrictions on lifting, walking, sitting, climbing, and various work conditions. [R. 29.] Finally, the ALJ found that Ms. Stokes was capable of performing her past relevant work and therefore not disabled at any time from April 24, 2000 to December 31, 2004. [R. 33-34.]

On May 10, 2009, Ms. Stokes requested that the Appeals Council review the second denial decision. [R. 11-17.] On July 8, 2009, her request for review was denied, making the ALJ's second denial decision the final decision of the Agency. [R. 8-10.]

## DISCUSSION

The Court's role in this action is limited to ensuring that "the ALJ applied the correct legal standard, and [that] substantial evidence supports the decision." *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004) (citation omitted). For the purposes of judicial review, "[s]ubstantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted). If the ALJ committed no legal error and substantial evidence exists to support the denial decision, the Court must affirm the denial of benefits. *See Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005).

To evaluate a disability claim, an ALJ must use the following five-step inquiry:

9

> (1) [is] the claimant … currently employed, (2) [does] the claimant ha[ve] a severe impairment, (3) [is] the claimant's impairment … one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, …can she perform her past relevant work, and [if not] (5) is the claimant … capable of performing any work in the national economy[?]

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (citations omitted).  After Step Three, but before Step Four, the ALJ must determine a claimant's residual functioning capacity ("RFC")—the claimant's physical and mental abilities considering all the claimant's impairments—which the ALJ uses at Step Four to determine whether the claimant can perform her own past relevant work (if any) and, if she cannot, at Step Five to determine whether the claimant can perform other work.  *See* 20 C.F.R. § 416.920(e).

Ms. Stokes asserts that the ALJ committed four errors in her evaluation of Ms. Stokes's disability claim.  [Plaintiff's Brief at 4.]  At Step Two, Ms. Stokes argues that the ALJ failed to obtain needed expert medical testimony from a rheumatologist about her possible fibromyalgia and that the ALJ wrongly failed to consider it as a severe impairment.  [*Id.*]  Ms. Stokes also assigns error to the ALJ's evaluation of her credibility and to the ALJ's decision to reject the opinions of the consultative examiners when computing her RFC.  [*Id.*]  The Court will consider each asserted error in turn.

### I. Step Two Errors

#### A. The Need for Testimony from a Rheumatologist

First, Ms. Stokes complains that the ALJ didn't exercise the ALJ's discretion to summon to the hearing a rheumatologist—"the relevant specialist," *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)—to testify about her fibromyalgia.  *See, e.g.*, 20 C.F.R. § 404.1527(f)(2)(iii) (permitting ALJs to "ask for and consider opinions from medical experts").  The ALJ's decision

not to do so is, to Ms. Stokes, especially perplexing given that the Appeals Council had previously directed the ALJ to summon a medical expert "if necessary" to properly evaluate her condition. [R. 243.] She notes that the orthopedic surgeon whom the ALJ did summon, Dr. Hutson, testified twice that he "d[oesn't] know what fibromyalgia syndrome is." [R. 582. *See also* R. 583.]

The Commissioner spends much of his response to Ms. Stokes' argument on this point accusing Ms. Stokes of taking Dr. Hutson's quotations out of context. In the Commissioner's view, Dr. Hutson understands the symptoms of fibromyalgia but does not understand its causes—a sentiment shared throughout the medical profession. [Defendant's Brief at 17.]

Assuming without deciding that the Commissioner correctly interprets Dr. Hutson's testimony, a remand would still be required because the Commissioner offers no defense at all of the ALJ's selection of Dr. Hutson rather than a rheumatologist to opine about Ms. Stokes' claim of disabling fibromyalgia. At Ms. Stokes' first disability hearing, the ALJ chose to summon only an orthopedic surgeon, Dr. Lorber. [R. 471.] The Appeals Council specifically directed the ALJ on remand to consider summoning a medical expert to testify about Ms. Stokes' fibromyalgia. [R. 243.] Nonetheless at the second hearing, the ALJ again chose to only summon an orthopedic surgeon, Dr. Huston—without providing any explanation of her decision not to summon a rheumatologist. Given the difficulty of properly assessing fibromyalgia in general, *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008), and given the mandate of the Appeals Council here, the ALJ's failure to explain her choice of medical expert constitutes error. *Cf. Howland v. Kilquist*, 833 F.2d 639, 646 (7th Cir. 1987) (requiring trial courts to set forth their reasons when declining to exercise discretion to appoint counsel for indigent litigants because "[a] decision made in the absence of a basis is an abuse of discretion" (quotation and alteration omitted)). If the ALJ

chooses not to summon a rheumatologist on remand, the ALJ must explain her choice, so that the Court can review it. *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005) (explaining that ALJs have a duty to create a record amenable to "meaningful appellate review") (citation omitted).

### B. The ALJ's Rejection of a Fibromyalgia Diagnosis

The ALJ here made two alternative findings regarding Ms. Stokes claim of fibromyalgia. First, the ALJ found as a matter of law that the condition couldn't support a disability award because Ms. Stokes' disability coverage ended on December 31, 2004, but Ms. Stokes wasn't diagnosed with it until April 2005, by Dr. Rau. [R. 27 ("[T]he entire discussion of fibromyalgia is not germane to the claimant's application for disability insurance benefits as *the claimant's first diagnosis of fibromyalgia post dates her date of last insurance coverage*…." (ALJ's emphasis).] In the alternative, the ALJ found Dr. Rau's diagnosis "preposterous" because he identified that Ms. Stokes had pain on as many as twenty-eight tender points, when the protocol developed by the American College of Rheumatology lists only eighteen points (of which at least eleven must be tender to support a finding of fibromyalgia). [*Id.*] Furthermore, the ALJ thought that Dr. Rau's failure to specifically list the tender points made it impossible for the ALJ to determine whether eleven of the recognized points were satisfied and precluded any "objective" evidence of fibromyalgia. [R. 27-28.]

With respect to the ALJ's first finding, Ms. Stokes argues that the ALJ ignored Seventh Circuit precedent, which requires only that a claimant present contemporaneous evidence establishing that the condition existed during the insured period—not an actual medical diagnosis during the period. *Allord v. Barnhart*, 455 F.3d 818, 822 (7th Cir. 2006) ("Retrospective diagnosis of an impairment, even if uncorroborated by contemporaneous medical records, but corroborated

12

by lay evidence relating back to the claimed period of disability, can support a finding of past impairment." (quotation and citation omitted)); *Wilder v. Apfel*, 153 F.3d 799, 802 (7th Cir. 1998) (requiring contemporaneous corroboration of the condition "but not necessarily contemporaneous medical corroboration" (citations omitted)).  And she claims to have presented just that type of corroborating evidence:  her records indicate that she complained of widespread bodily pain—fibromyalgia's principal symptom, *Sarchet*, 78 F.3d at 306—during her insured period, [*see, e.g.*, R. 120 (describing pain in her thoracic and lumbar regions), 133 (describing pain all along her back and legs), 386 (same)].

The Commissioner doesn't defend the ALJ's mistaken belief about the importance of a fibromyalgia diagnosis during Ms. Stokes' insured period.  Nor could he given the precedents that Ms. Stokes has cited.  The ALJ clearly erred in concluding that a medical diagnosis was required during the insured period.  Corroborating evidence is all the law requires.  So, instead, the Commissioner defends the ALJ's alternative finding, about the insufficiency of the evidence of fibromyalgia.  [*See* Defendant's brief at 15.]  The crux of his defense is that, based upon the testimony of Dr. Hutson and upon the ALJ's assessment of Ms. Stokes' diminished credibility, the ALJ was well within her rights to find that Ms. Stokes had failed to prove that she suffered from fibromyalgia during her insured period.

As discussed above regarding the Dr. Hutson's ability to assess Ms. Stokes' fibromyalgia and as discussed later regarding the ALJ's assessment of Ms. Stokes' credibility, the ALJ erred. The resolution of those errors on remand may well impact the ALJ's view of the sufficiency of the evidence regarding fibromyalgia during the insured period.  For example, a rheumatologist may be able to offer a more substantive conclusion about the possible presence and extent of Ms. Stokes' fibromyalgia from Dr. Rau's notes and/or from the report of Dr. Bradley, the consulta-

tive physician who found tenderness in several locations that the Commissioner doesn't dispute are consistent with fibromyalgia. [*See* Plaintiff's Reply at 5-6.] Alternatively, even absent testimony from a rheumatologist, the ALJ might conclude that her testimony and the other medical records support a finding that she did in fact have tenderness in the eleven required locations, if the ALJ believes that testimony after more carefully considering its credibility. *See Allord*, 455 F.3d at 822 (involving a claim of post-traumatic stress disorder and suggesting that the ALJ on remand might find contemporaneous corroboration of the disorder on the basis of the claimant's testimony, if believed).

### II.  The Credibility Determination

Ms. Stokes next argues that the ALJ erroneously assessed her credibility, in at least seven different ways.

As she appropriately notes in her reply, the Commissioner offer no explicit response to six of the factual and legal errors that she specifically identified in her opening brief—for example, the ALJ's discounting of Ms. Stokes' claim of pain all over as vague and thus incredible, even though such pain is a symptom of fibromyalgia. [Plaintiff's Brief at 26.] The Court interprets the Commissioner's silence as an acknowledgment of those identified errors.

The Commissioner does offer a defense to one of the errors that Ms. Stokes cites:  The ALJ's assertion that Ms. Stokes alleged disabling pain was inconsistent with a four-year gap in her medical treatment despite her limited means.  Noting that Ms. Stokes' husband had been working during that time even though Ms. Stokes had no health insurance, the ALJ opined that "[o]ne may reasonably infer that if the claimant experienced debilitating pain during this four-year period she would have garnered sufficient resources to see a doctor at least one time." [R. 31.]  That reasoning, the Commissioner argues, comports with SSR 96-7p, which permits ALJs

to draw adverse inferences about a failure to pursue treatment absent "good reasons" from the claimant. SSR 96-7p.[4]

The problem with the ALJ's rationale is that the Commissioner has been unable to cite to any evidentiary basis that Ms. Stokes actually could have afforded medical treatment before she ultimately presented herself to the—free—Volunteers in Medicine clinic at the end of her treatment hiatus. Without that necessary factual finding, which the ALJ didn't make, the ALJ's reasoning is impermissibly predicated upon speculation. Had the ALJ followed up further during Ms. Stokes' testimony, Ms. Stokes might have testified, for example, that some other financial obligation was more pressing to her husband.

Despite the high level of deference afforded to an ALJ's credibility assessment, *e.g., Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (citation omitted), the numerous factual and legal errors underpinning the ALJ's credibility assessment make a remand necessary for a credibility re-evaluation. *See Allord*, 455 F.3d at 821 (remanding for a credibility re-evaluation on the basis of three factual errors).

### III. The Rejection of the Opinions of the Consultative Physicians

ALJs must weigh medical opinions using the framework set out in 20 C.F.R. § 404.1527(d)(1). It provides six factors that make one particular medical opinion more persuasive than another. Ms. Stokes argues that the ALJ here wrongly applied four factors when deciding to disbelieve the opinions of Drs. Arizmendi and Bradley. Those two consultative physicians examined her, in February 2004 and August 2004 respectively, and concluded that she "could not perform even sedentary exertion." [R. 243.]   Instead, the ALJ adopted Dr. Hutson's opinion.

---

[4] In a footnote the Commissioner offers two, post-hoc, arguments about Ms. Stokes' failure to seek medical treatment. [Defendant's Brief at 24 n.7.] But because post-hoc arguments aren't permitted, *e.g.*, *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947), the Court rejects them, also in a footnote.

15

At this time, however, any consideration of the ALJ's decision to prefer the opinion of Dr. Hutson over that of the consultative physicians would be premature given the ALJ's failure to properly consider Ms. Stokes' fibromyalgia claim and given the ALJ's failure to properly evaluate Ms. Stokes' credibility.  For example, had the ALJ summoned a rheumatologist, that doctor would have added another medical opinion against which the consultative physicians' opinions and Dr. Hutson's opinion.  *See* 20 C.F.R. § 404.1527(d)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").[5]  Likewise, had the ALJ believed that Ms. Stokes suffers from fibromyalgia or suffers pain of the intensity that Ms. Stokes claims, the ALJ might not have disbelieved Dr. Bradley's opinion that Ms. Stokes' pain limits her ability to stand and walk.  [R. 32.]  Accordingly, the Court declines to address Ms. Stokes' claims of error here until they are ripe for review.

## CONCLUSION

Because the ALJ erred in the evaluation of Ms. Stokes' fibromyalgia claim and improperly assessed her credibility, the Commissioner's decision cannot be affirmed but is instead **VACATED,** and this action is **REMANDED** back to the Commissioner for further proceedings.  42 U.S.C. § 405(g) (sentence four).   On remand, the Court strongly recommends that the Commissioner assign a new ALJ to this matter.  The ALJ apparently disbelieved Ms. Stokes's testimony on two prior occasions.  It may be difficult, if not impossible, for the current ALJ to ever conclude otherwise.

---

[5] Ms. Stokes notes, correctly, that the rheumatologist's opinion regarding fibromyalgia would also ordinarily be entitled to greater weight than that of Dr. Hutson with respect to that issue. *See* 20 C.F.R. § 404.1527(d)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.").

08/23/2010

*[signature: Jane Magnus-Stinson]*

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via CM/ECF only:**

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

Timothy J. Vrana
tim@timvrana.com